Your Honor, I am Stanley Hodge. I represent the plaintiffs in this matter. And may it please the court and counsel, there are some things I wish to mention to the court before I get into the vacuum matters that I would like to mention because I think they are important. I noticed in reviewing for today that in my brief, I made the statement that Warden Holland had chaired the committee that approved these two gentlemen for double selling. That's not the case. Warden Holland made a determination that Mr. Taylor should not be double sold. And also, as I read the record, approved Mr. Smith for being double sold. Thank you. I appreciate the clarification. And I wanted to kind of get in real quickly to understanding who's being sued here and who's not being sued. As I read the complaint and I read the briefs, the lawsuit was filed against Holland, Vasquez, and Brown, correct? Right. There was no lawsuit against Campbell? Right. No lawsuit against Kirby? Correct. And no lawsuit against, is it Nobles or Knowles? Knowles was included, as I recall. Knowles, are you sure about that? I'm not, but as I, let me see. Knowles was not. Okay, so we have those three and then we have some John Doe's it looks like. But amongst the John Doe's, you're not alleging that Campbell, Kirby, or Knowles were one of the John Doe's? Correct. Okay. Is there anything that would have prevented you from filing suit against Campbell, Kirby, or Knowles? No, Your Honor. It was my judgment that the action against Gordon Holland was sufficient in that regard. Because what I'm trying to understand is, as I understand this case, the main theory is that there was an error in placement, correct? That these two guys should not have been in the same cell. That's the first thing. The second thing is, and it was brought to light most strongly in my mind by the declaration of Gordon Holland, that there were rules established for the. The checks? For the checking on the welfare of prisoners. As I recall, it was four times within 24 hours and then random checks every 30 minutes. Now, one of the guards, and I think it was Mr. Knowles, implied that that was being done. And Mr. Vazquez testified that that practice of actually having those 30 minute checks didn't come into effect until after this event had taken place. So that is also a problem. And on Gordon Holland's part, the lack of supervision, which I think is brought to light manifestly in her declaration. But just so we're clear here, so you have, in my words, Vazquez and Brown are the floor guards, in a sense, who are responsible for monitoring what's going on in the cells, correct? Correct. And then you have Holland as the warden whose job is overseeing general operations and so forth. But again, Campbell, Kirby, and Knowles, who were more involved in the actual decision to place these two men together, are not being sued and not at issue in this case. Correct. Okay. Correct. And that is why I do wish to stress the failure on the part of the staff there and Gordon Holland to adequately monitor the prisoners and on Gordon Holland's part to supervise. Now, Gordon Holland indicated that she went around and visited from time to time, but that as of the date of this incident, she did not know that the policies of the department and of that institution were not being followed. Well, I'm having a little trouble with the wording of the declaration. I would read it to say she did, if they weren't being followed, she didn't know it, not that she is positively saying they weren't being followed and I didn't know it, which is a different matter altogether. Your Honor, I am looking at the declaration of Warden Holland, and in paragraph 8, line 25 on page 2, she says, as of July 15, 2012, I had no knowledge that either inmate counts or inmate welfare checks were not being conducted. She had no knowledge that they weren't being conducted. So if you take out the double negative. Well, if I had become aware that inmate counts or inmate checks were not being conducted, I would ensure the appropriate steps were taken to ensure the counts and welfare checks were conducted, including additional training, corrective action, and appropriate referral for disciplinary action. Is there any evidence that counts and welfare checks were not being conducted? Yes. What's that? Deputy Vasquez testified that the 30-minute checks, which another witness had testified were being conducted, were not being conducted until after this incident. And so what was being done? If it wasn't 30 minutes, was it an hour? Was it no welfare checks? What's the evidence? On the day in question, it appears that the welfare of these two men weren't noticed until the evening meal was being delivered. At 3.15? Yes. Vasquez came on at 2, and the tragedy was discovered at 3.15. When it occurred, we do not know. Counsel, looking at page 114 of the record, which is the Holland Declaration, and under paragraph 6, she mentions that the institutions were required to conduct at least four counts of inmates during each 24-hour period. Now, what is your contention? That the Constitution requires more frequent welfare checks, or that the four were not followed? What's the center of your theory here? My theory is as follows, Your Honor. We have two men which were placed in a segregated housing unit because they were, number one, they were mentally ill. They had personality disorders. Number two, they were both had been convicted of homicides. Right. And that they were nevertheless, after a five-minute, five to ten-minute meet and greet, they were allowed to be placed together. That seems to me to be indifferent. That procedure, in and of its face, when we're dealing with these kinds of people, if we were dealing with adult dealers or forgers, that would be one thing. But we're dealing with two people. I understand that argument that you're making, Counsel, but what I'm not sure of is what your position is with respect to the frequency of welfare checks. Okay. My position is from reading Deputy Holland's or Warden Holland's declaration and from Mr. Voska's testimony is that those 30-minute checks were not being conducted. Those which? Were not being conducted. He said the 30-minute checks. The 30-minute checks were not being conducted, it appears to me, from Warden Holland's declaration and as his deposition, Mr. Voska has testified that those 30-minute checks were not being made until after Mr. Smith was murdered. Well, let me jump in here. But where did the suggestion of 30-minute checks come from? The declaration of Warden Holland talks about at least four counts every 24 hours. If we look at Paragraph 7 of her declaration, Your Honor, it says, it is my understanding that as of July 15, 2012, in Facility A, it would take place every half hour. Okay, I see that. Right. Very well. Okay, thank you. And Deputy Voska has testified they were not. But, Cass, let me get to kind of the big question in this case for me is that let's assume it was a prison policy to check every 30 minutes. The officers, I believe, have raised qualified immunity in this case. And so where is the clear authority from the Supreme Court or the Ninth Circuit or maybe some federal law that says that would have put these officers on notice that the failure to do welfare checks every 30 minutes is a violation of some federal right, constitutional or otherwise? Well, it is my understanding, and I believe the case is Farmer v. Brennan, that the guards have a constitutional obligation to maintain the safety of the prisoners. Certainly, but I think the Supreme Court has reminded this Court, among others, that you can't look at it in a very general sense. You have to have something more specific than that. So it can't just be the general right to be, you know, not be harmed by cruel and unusual punishment, for example. It must be something specific. Is there a specific case or statute you can point us to? Your Honor, I would point to the California Code of Regulations, which have been cited by both sides in this case, in which prison personnel are instructed to maintain the safety of prisoners and what procedures are to be followed. Now, our case law looks, I should say, I don't want to say frowns upon, but is not a huge fan of citing state regulations as a basis to trigger 1983 liability. Is there anything else, any other cases or statutes you can point to other than the California Code? With regard to this kind of situation? Yes. No, Your Honor. Okay. Do you want to save your time for rebuttal? Yes, I will for the final few minutes. Thank you, Your Honor. Good morning. Lawrence Bragg, Deputy Attorney General representing defendants in Appalese. May it please the Court. The district court correctly granted summary judgment for the defendants in this case for an incident that is unfortunate but also unpredictable because there was no information available to the defendants in this case that Mr. Smith faced a substantial risk of harm, and so the defendants were not deliberately indifferent in this particular case. And in this particular case, as the Court has pointed out already, the defendants were not personally involved in making the decisions to house the two inmates together. Let me ask you about that. Is there any reason why the plaintiffs could not have sued Campbell? I mean, I guess you can sue anyone for anything, but is there any provision in California law or federal law that would have prevented a lawsuit against Campbell, Kirby, and Knowles? They could have done that. Campbell, Kirby, and Knowles were their names were on the documents that were disclosed. What we call the marriage chrono that the two inmates signed also indicates that Kirby had reviewed the file and that it had been approved by Knowles. That document has been available to everybody from the outside of the case. Clearly Vasquez and Brown had no involvement in the cell placement. What was Holland's involvement in the cell placement? None. She was not involved at all, and she wasn't even present when this all took place. It really was a matter of scheduling in the sense that Mr. Taylor came into the institution late on a Friday, and it was Friday the 13th, I believe, and that there was a classification hearing that was scheduled for the following week, but the incident happened before it took place. So Warden Holland really never had the opportunity to get involved in this particular placement. So she had no involvement whatsoever. She had approved Smith for double celling. She had approved Smith for double cell, and that had happened on June 6th, and I think it's important to point out that when that happened, that there was a mental health professional, Dr. Stalkup, that was present at the committee hearing and certainly had the opportunity to give his input as to whether or not Mr. Smith was suitable for double cell. And certainly there was no comments in the record that would indicate that Mr. Smith was subject to being a victim or subject to predatory attack at all. And she didn't determine that Taylor could be double celled? No. Well, I take that back. Back in 2011, on October 13th, 2011, when Mr. Taylor had requested a cellmate, and then there was a review that was done, and I believe Warden Holland was involved in that, and that's in the record at Excerpts of Record 82. And then there were at least two subsequent committees at Salinas Valley State Prison where Mr. Taylor's situation was re-evaluated, and he was including re-evaluations by mental health professionals where his mental condition was described as stable, and it was decided in those two proceedings that he was suitable for double cell housing. And those are in the record at Excerpts of Record 86 and 88. So the most recent information, the most recent evaluations of Mr. Taylor did not involve Warden Holland. So he had been at Tehachapi first and then gone to SVSP and then back to Tehachapi? That's correct. That's correct. So in this particular case, there was no personal involvement of the defendants in the decisions to place them together, and there also is no evidence that they were placed together because of prison overcrowding. There's the undisputed fact set forth in the moving papers was fact number 38, which said that prison overcrowding was not a factor in placing these, the two individuals together, and the plaintiff said that was undisputed, and that's at the supplemental Excerpts of Record at page 2. And with respect to the contention that Officer Vasquez said that welfare checks were not being conducted, I believe that that misstates the evidence. And if you look at Excerpts of Record 367 and 369, what was described was that that before the incident, Mr. Vasquez testified that welfare checks were taking place every 30 minutes to an hour, and that after the incident, they changed to every half an hour. That's Vasquez's testimony. Oh, really? And so there's no testimony that they were not being done at all. And in fact, the testimony is to the contrary, in that Officer Garcia was deposed and he testified that not only that they were being done, but also that the conduct that was taking place at the time that this incident was discovered, which was providing showers to the inmates in that section of the prison, actually is a form of a welfare check, because in order to determine if the inmates want to have a shower, you have to encounter them and find out if they are physically well. And so that's actually a form of a welfare check. And that's undisputed as well. Dispute effects would have to be resolved in favor of the nonmoving party, of course. Well, the point I'm trying to make, Your Honor, is that in the moving papers, the plaintiffs said that that was undisputed. It was undisputed when Garcia testified that it was fact number 51. Garcia's deposition testimony is in the record at page 44. He testified that a shower was a form of that. I'm sorry. I was alluding back to the Vasquez testimony, whether he said that the half-hour policy didn't come into effect until after the killing. You're saying he also said before that, and I'd be interested if you happen to have a cite handy for that, that although it wasn't every half hour, it was every hour. I believe it's at 369. So he said that that's what it was. I'm sorry. I misspoke. At 369, he talks about what the policy was afterwards, which was every 30 minutes. At 367, every half hour to an hour, welfare checks are done. So they were being done before. And there's no testimony cited from Vasquez or anybody else saying that welfare checks were not being done. And certainly, there's no evidence that Ward Hall was doing that. So also, with respect to the issue of deliberate indifference, there was no information available to anyone at the California Correctional Institution that there would be a substantial risk of harm of placing these two men together. And not only had they been cleared, both had been cleared for double cell housing after evaluations of their prison records. Also, there was, as I mentioned before, there was input from mental health professionals that they were sufficiently stable to handle that. But I also would point out, in the case of Mr. Taylor, that Mr. Taylor was first placed with inmate Brown when he arrived at the California Correctional Institution. And then Mr. Taylor raised an issue of his compatibility with inmate Brown. And he said that inmate Brown made too much noise and he couldn't sleep. Talked too much. Talked too much. And that he requested a cell move. And what that demonstrates is because, at least in that instance, that Mr. Taylor did not attack inmate Brown because he was talking too much, and he dealt with it in a nonviolent way by working within the prison system and requesting a cell move, that's further evidence that there was no indication to anyone at the institution that there was going to be any substantial risk of harm in placing these two men together. And also, they were allowed to meet for a period of time and discuss their backgrounds and their compatibility, and they signed a form that indicated that they both felt that they were compatible. So there was no information available to anybody that an attack was likely to take place. And for that reason, not, you know, conducting showers rather than conducting a welfare check does not constitute deliberate indifference because conducting showers under those circumstances is not deliberately indifferent to a substantial risk of harm to Mr. Smith. Brown was in a different building altogether at the time, as I understand it. That's right. And that's also undisputed. So from a failure to intervene perspective, Officer Brown didn't have any opportunity to get involved in this whatsoever. And so there also is a causation issue in that even if there was a constitutional requirement for welfare checks to happen every so often, which no one has said, but if there was and that didn't happen in this particular case, there's no issue as to, I mean, there's no indication as to when the attack took place. So there's no indication as to whether or not this attack took place even before Officer Vasquez came on duty. So even if Officer Vasquez had violated the Constitution in this way, it's not a material issue of fact because there's no demonstration that had he followed that rule, it would have prevented this attack from taking place at all. And so therefore, there's no facts in the record that indicate that Officer Vasquez had a reason or anybody else had a reasonable opportunity to avoid this particular incident. And then with respect to the issue of qualified immunity, in the alternative, the defendants are entitled to qualified immunity because there is no clearly established law that inmates either are entitled to single cell housing or under the facts of this particular case that some steps should have been taken to prevent them from not being celled together. We would cite two case law that actually holds to the contrary. The Rhoades v. Chapman case holds that there is no constitutional right to single cell housing. And then there is a decision from this Court in Labitad v. Correctional Corporation at 714F3-1155 where it held that it was not deliberate indifference to house members of two gangs together even though common sense might indicate that the two gangs might have some rivalry when there was no specific information available to the correctional officers that the two particular inmates involved in the altercation were likely to attack each other. And that case is directly analogous to this case in that there is no specific information available to anybody at California Correctional Institution that this attack was likely to take place. So based on the evidence in the record, the district court's decision should be affirmed. And if unless there are any further questions, I would submit it. No questions here. All right. Thank you very much, counsel. Thank you. You have about three minutes. Thank you, Your Honor. I would like to respond, Your Honor, to counsel's statement that there was no information available to the department that this attack was likely to take place. I don't want to reiterate what I've talked before about these gentlemen's convictions, but since they had been incarcerated, both of them had attacked other prisoners. I believe it was Taylor had threatened a worker or a guard at one of the prisons. And counsel appropriately pointed out that one of the aspects that goes into making these housing decisions is input from the mental health professionals. Now, with regard to Mr. Taylor, let me back up. Let me talk about Mr. Smith. Mr. Smith said to mental health professionals that he was hearing voices, that he was becoming increasingly paranoid. And Mr. Taylor had earlier attacked, actually both of them had, earlier attacked inmates in the cells and outside the cells. But Mr. Taylor specifically told a mental health professional, after he had assaulted another prisoner in his cell, that I told you I was going to do that in the exact language, it may have been kill, it may have been attack, and I did it. So they were on plenty of notice that both these men attacked people, had significant mental problems, and in fact, one of them, who turned out to be the killer, had told the mental health professionals, which was, I think we all agree, considered, that I told you I was going to attack somebody, and I did. There was something odd about that, though. Then they went on to say, the mental health person went on to say, no, you actually didn't, and he said, well, you're right, I didn't. I don't recall that. I just was stunned that he had attacked somebody and then told a mental health professional that he had told them that he was going to. In fact, it was obviously in his mind that he had told people he was going to attack and perhaps indicating a proclivity for this kind of conduct. So it seems to me that the fact that this attack would take place with these two people, under these circumstances, given their past conduct and their states of mind, was quite predictable. Thank you very much, counsel, for your argument. This matter is submitted and this particular panel is adjourned. Thank you.
judges: O'scannlain, Owens, Wilken